CITY OF COLUMBUS, APPELLANT, *v.* STATE EMPLOYMENT RELATIONS BOARD ET AL., APPELLEES.

(No. 85CV-02-797 — Decided March 8, 1985.)

APPEAL: Court of Common Pleas of Franklin County.

*Donald R. Keller* and *Lawrence G. Muscarella,* for appellant-respondent city of Columbus.

*Anthony J. Celebrezze, Jr.,* attorney general, *Joseph M. Oser* and *Loren L. Braverman,* for appellee-complainant State Employment Relations Board.

*Robert W. Sauter, James E. Phillips* and *Jonathan R. Vaughn,* for appellee-intervenor Fraternal Order of Police, Capital City Lodge No. 9.

*Bernard A. Berkman,* for *amicus curiae* American Federation of State, County and Municipal Employees.

CRAWFORD, J. This cause came to be heard on appellant's (city of Columbus') notice of appeal from the February 6, 1985 order and opinion of the State Employment Relations Board ("SERB") ordering the following:

"(a) Respondent [Columbus] will cease and desist from interfering with, restraining or coercing employees in the exercise of their rights guaranteed in [R.C.] Chapter 4117, or refusing to bar-gain collectively with the employees' representative, and from otherwise violating Ohio Revised Code Section[s] 4117.11(A)(1) and (5).

"(b) Respondent will post for 60 days in all City of Columbus Police Stations the Notice to Employees furnished by the Board stating that the Respondent shall cease and desist from the actions set forth in paragraph (a).

"(c) Respondent and the FOP shall immediately engage in conciliation under R.C. 4117.14(D)(1) and (G).

"(d) The order incorporating these mandates is effective as though issued on December 31, 1984, and all cost items, if any, shall be effective retro-actively to that date."

In addition to the order, the city appeals from the opinion of SERB in which the following recommendations and findings of fact of the hearing officer were adopted:

"(a) The Complaint in this case is properly issued.

"(b) A SERB order to bargain is not a necessary prerequisite before the statutory impasse commands become operative.

"(c) The Police Safety Officers in-volved in this case are 'members of a police department.'

"(d) The parties to the litigation have not agreed on a mutual dispute set-tlement process which supersedes the statutory impasse procedures in R.C. 4117.14.

"(e) There is an employer (respon-dent) refusal to bargain in this case."

In submitting this case, the par-ties, the city of Columbus ("city"), the State Employment Relations Board ("SERB"), and the Fraternal Order of Police, Capital City Lodge No. 9 ("FOP"), have agreed to the following statement of facts:

"1. The Respondent, City of Colum-bus, is a 'public employer' as defined by

Ohio Revised Code Section 4117.01(B). * * *

"2. The Capital City Lodge No. 9, Fraternal Order of Police is an 'employee organization' as defined in Ohio Revised Code Section 4117.01(D). * * *

"3. In June, 1984, the FOP and Respondent entered into a recognition agreement, wherein the Respondent recognized the FOP as the sole and exclusive bargaining agent for the Respondent's employees in the described units listed on the complaint and Notice of Hearing. At all relevant times the FOP has been the exclusive representative of the employees in these units:

"(a) A bargaining unit composed of all sworn Police Officers below the rank of Sergeant who are employed by the City, but excluding Public Safety Officers;

"(b) A bargaining unit composed of all sworn Police Officers holding the rank of Sergeant or above who are employed by the City, but excluding the Chief, Deputy Chiefs, and Public Safety Officers;

"(c) A bargaining unit composed of all sworn Public Safety Officers below the rank of Sergeant who are employed by the City;

"(d) A bargaining unit composed of all sworn Public Safety Officers holding the rank of Sergeant or above who are employed by the City.* * *

"4. On or about August 2, 1984, the FOP formally served upon the Respondent a Notice to Negotiate pursuant to Ohio Revised Code Section 4117.14, as the exclusive representative for the employees of the units described above.* * *

"5. Collective bargaining agreements were signed by and between the City and police officers on or about May 9, 1983, and with Public Safety Officers

(PSO's) on or about May 27, 1983, with provisions of said agreements effective as of September 26, 1982, and October 1, 1982. The Duration Article of the Police Officer agreement, Article XXX, and the Duration Article of the PSO's agreement, Article XXVII, are substantially identical and read, in full, as follows:

" 'Section 1. Duration. All of the provisions of this Agreement become effective October 1, 1982, unless otherwise specified. This Agreement shall continue in force and effect until 11:59 p.m., September 30, 1984, and thereafter from year to year unless at least 90 days prior to September 30, 1984, or any anniversary subsequent either party shall give timely written notice to the other of an intent to negotiate any or all of its provisions.[1]

" 'Section 2. Mediation. Either party may, at any time during the period beginning September 15, 1984, and including October 15, 1984, upon written notice to the other party, institute a mediation request with the Columbus Office of the Federal Mediation and Conciliation Service (F.M.C.S.). Should the F.M.C.S. agree to assist the parties upon this unilateral request of either party, the other party agrees to fully participate in any and all mediation sessions called by the F.M.C.S. Nothing herein shall preclude the parties from requesting the mediation services of the F.M.C.S. at any time upon mutual agreement to do so.'

"* * *

"7. PSO's are employed by the City of Columbus Division of Police, within the Public Safety Bureau, Special Operations Subdivision. This subdivision is headed by a Deputy Police Chief who reports to the Chief of Police.* * *

"8. The Director of Public Safety, who heads the Columbus Division of

---

[1] The underlined portion appears only in the Police Officer Agreement. In the PSO's agreement, the words following both under-lined clauses, "at" and "either," begin new sentences.

Police, is the Public Safety Officer's appointing authority.* * *

"9. Public Safety Officers are appointed from a duly established civil service eligibility list and examination. Police Officers are appointed from a separate duly established civil service eligibility list and examination.* * *

"10. Public Safety Officers have police power to enforce the Columbus City Code and the Ohio Revised Code over the City Reservoirs, Reservoir land, waterways, City-owned parks, City-owned land controlled by the Division of Airports and the Columbus Municipal Zoo during the assigned duty hours. Public Safety Officers may be dispatched outside of said jurisdiction in case of serious emergencies or disasters.* * *

"11. Sometime during 1977 there was a change in classification title from Special Police Officer to Public Safety Officer. There are three (3) different classifications: Public Safety Officer 1, 2, and 3.* * *

"12. At the present time there are fifty-two (52) Public Safety Officers in the three (3) classifications.* * *

"13. All Public Safety Officers wear a uniform which is prescribed by the Uniform Committee of the Division of Police.* * *

"14. Public Safety Officers are members of the Public Employees Retirement System, while Police Officers within the Division of Police are members of the Police and Fire Disability Pension Fund.* * *

"15. Public Safety Officers and Auxiliary Officers are not authorized to carry firearms off-duty without permission from the Chief of Police. Police Officers are required to carry an approved firearm that is loaded at all times except under stated conditions.* * *

"16. Public Safety Officers are required to have obtained the Ohio Peace Officer Training Council Certificate. This encompasses approximately three hundred (300) hours of training. Sworn Police Officers within the Division of Police receive in excess of eight hundred (800) hours of training at the Training Academy when they are first appointed. * * *

"17. The medical requirements for employment are different between Public Safety Officers and Sworn Police Officers.* * *

"18. The patch that Public Safety Officers wear on their uniform states 'Columbus Police' upon it.* * *

"19. Formal bargaining between the FOP and the Respondent began in 1975, which resulted in the first written agreement between the parties. This agreement was effective April 1, 1976 through September 30, 1978.* * *

"20. In this first written agreement, and all subsequently negotiated agreements including the last agreement in effect from October 1, 1982 to September 30, 1984, a provision was included allowing the parties to engage in mediation. The language of the mediation provision was identical from contract to contract, except for the changing of the relevant dates for the time period within which the mediation request might be made. The mediation clause reads as follows:

" 'Either party may, at any time during the period beginning [relevant date 15-days prior to expiration of agreement], and including [relevant date 15-days after the expiration of agreement], upon written notice to the other party, institute a mediation request with the Columbus Office of the Federal Mediation and Conciliation Service (F.M.C.S.). Should the F.M.C.S. agree to assist the parties upon this unilateral request of either party, the other party agrees to fully participate in any and all mediation sessions called by the F.M.C.S. Nothing herein shall preclude the parties from requesting the mediation services of the F.M.C.S. at any time upon mutual agreement to do so.'* * *

"21. The most recent collective bargaining agreement, was ratified by

the FOP membership on February 24, 1983.* * *

"22. During the 1984 negotiation sessions, dispute resolution procedures were discussed by the parties, however, no agreement was reached.* * *

"The above are all of the facts to which the parties have stipulated. The recitation of the above facts is not all-inclusive and is not intended to preclude any party from asserting other facts as found by the Hearing Officer or by SERB, or any other factual matters as are reflected in the record.

"* * *"

Subsequent to the filing of the complaint (February 26, 1985), SERB filed a cross-petition pursuant to R.C. 4117.13 (A) seeking enforcement of its February 6, 1985 order.

### Background

On July 6, 1983, the Governor of the state of Ohio signed Amended Substitute Senate Bill No. 133 ("Am. Sub. S.B. No. 133") which took effect on April 1, 1984. (See 140 Ohio Laws, Part I, 336 *et seq.*) Am. Sub. S.B. No. 133 granted to public employees in Ohio the statutory right to bargain collectively. Prior to the effective date of Am. Sub. S.B. No. 133, the state of Ohio was, on the surface, operating under the auspices of the now repealed Ferguson Act, former R.C. 4117.01 to 4117.05, which prohibited strikes by public employees.

The right to collectively bargain in the United States has been nationally recognized since the inception of the National Labor Relations Act ("NLRA"), which created the right of private employees to engage in concerted activities for purposes of bargaining wages and other conditions of employment. Efforts to extend the rights granted under the NLRA to public employees on a national basis have failed in Congress on at least two different occasions.[2]

At the time of passage of Am. Sub. S.B. No. 133, thirty-seven states had a collective bargaining process for at least some of their public employees.[3] Prior to 1983, the Supreme Court, in *Dayton Classroom Teachers Assn.* v. *Dayton Bd. of Edn.* (1975), 41 Ohio St. 2d 127, 70 O.O. 2d 223, 323 N.E. 2d 714, held that public employees had the right to collectively bargain and be recognized as a union only with the explicit consent of their public employer.

This court realizes that the Ferguson Act did not function as it was written. "The General Assembly, like Congress before it, was faced with the task of remedying the problem of labor unrest [in Ohio].* * * In spite of the Ferguson Act, strikes had for years plagued the State and local governments." (Brief of SERB at 37.)

Regardless of the political and/or practical considerations for the enactment of Am. Sub. S.B. No. 133, it was passed and, for the first time in Ohio, granted to public employees the statutory right to bargain collectively.

### The Act

This court will not provide a detailed analysis of Am. Sub. S.B. No. 133, codified in R.C. Chapter 4117 (the "Act"). However, it is necessary to give a general overview of the Act's provisions and the procedures applicable to this case.

R.C. 4117.22 provides:

"Chapter 4117. of the Revised Code shall be construed liberally for the accomplishment of the purpose of promoting orderly and constructive relationships between all public employers and their employees."

The Act generally gives public em-

---

[2] H.R. 1987, 95th Cong., 1st Sess., 123 Cong. Rec. 1335 (1977); H.R. 9730, 93rd Cong., 1st Sess., 119 Cong. Rec. 27,062 (1973).

[3] 21 Govt. Emp. Rel. Rep. (BNA) (1983), at 1464; and White et al., Ohio's Public Employee Bargaining Law: Can It Withstand Constitutional Challenge? (1984), 53 U. Cin. L. Rev. 1 (hereinafter "White").

ployees the right to unionize and to bargain collectively. The Act also creates the three-member SERB which is responsible for implementation, administration and enforcement of the provisons of the Act. (R.C. 4117.02.) The Act appears to be fashioned after the NLRA; however, the sweeping provisions of the Act seem to go well beyond the scope of the NLRA.

The Act covers "all matters pertaining to wages, hours, or terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement * * *." (R.C. 4117.08 [A].)

Exemptions from the negotiation provisions of the Act include: (1) civil service procedures (R.C. 4117.08[B]) and, (2) matters not agreed to by the employer including matters of inherent managerial policy and supervisory and disciplinary procedures. (R.C. 4117.08 [C].)

The Act also creates a sophisticated dispute resolution procedure. In general, the procedures, on a step-by-step basis, are as follows:

(1) Negotiations;

(2) Upon a failure of negotiations, mediation;

(3) Fact-finding;

(4) Mediation by the fact-finding panel;

(5) Submission of the recommendation of the fact-finding panel to the public employee organization and the public employer. (See R.C. 4117.14.)

Upon failure of the above, and upon publication by SERB of the recommendations of the fact-finding panel:

(6) Members of a police or fire department, etc. (R.C. 4117.14[D][1]), shall submit to binding interest arbitration at which a conciliator shall decide the issues as to the parties' final offer on an issue-by-issue basis. (R.C. 4117.14 [D][1] and [G].) Such decision of the conciliator is to be rendered according to statutory considerations (R.C. 4117.14

[G][7]) and is subject to review by the common pleas court (R.C. 4117.14[H]);

(7) Public employees, not defined in paragraph 6 above, have the right to strike. (R.C. 4117.14[D][2].)

The procedures at issue in this case deal with the dispute resolution procedure set forth in the Act for members of a police department.

R.C. 4117.14(D)(1) provides in part:

"Public employees, who are members of a police or fire department * * *."

R.C. 4117.01(M) provides in part:

" 'Member of a police department' means a person who is in the employ of a police department of a municipal corporation as a full-time regular policeman or policewoman as the result of an appointment from a duly established civil service eligibility list * * *."

### Issues Presented

As set forth by the city in its brief, the issues presented are as follows:

"I. The State Employment Relations Board erred in finding that the unfair labor practice complaint was properly issued in accordance with statutory requirements.

"II. The Board erred in finding that the statutory obligation to engage in fact-finding is compulsory and that the statute is self-executing, thereby relieving the Board of any necessity to issue an order before the statutory impasse commands became operative.

"III. The Board erred in determining that the parties have failed to agree upon a mutual dispute settlement process which supersedes the statutory impasse procedures contained in R.C. Section 4117.14.

"IV. The Board erred in finding that public safety officers are 'members of a police department.'

"V. The Board erred in ordering the parties directly to conciliation retroactive to December 31, 1984, with all cost items, if any, effective retroactive[ly] to that date.

"VI. The Columbus City Charter provisions establishing legislative procedures and requirements for the passage of wage ordinances and entering contracts, agreements or other obligations, involve powers of local self-government which conflict with and supersede R.C. Section 4117.14(C)(6).

"VII. The final offer settlement procedure established by the Act is in conflict with and superseded by the mandatory duty imposed upon City Council by Charter Section 15 to fix the salary and compensation of city employees by ordinance.

"VIII. The final offer settlement procedure established in R.C. Section 4117.14 presents an unconstitutional delegation of legislative authority."

The court will first address the constitutional issues presented by the city in Issues Nos. VI, VII, and VIII. The other issues will be addressed in the order in which the city has presented them.

Constitutionality of the
Binding Arbitration Provisions —
R.C. Chapter 4117

A. Constitutional Provisions

It is a general principle of law that courts must indulge in the strong presumption in favor of the constitutionality of legislation. All doubts regarding legislation should be resolved in favor of constitutionality because without such presumption the judicial branch of government would be perceived to be encroaching upon the rights of the legislative branch. See 16 Ohio Jurisprudence 3d (1979), Constitutional Law, Sections 156-158.

The city, in Issues Nos. VI, VII, and VIII, has alleged that the binding arbitration provisions of R.C. Chapter 4117 are violative of Sections 3 and 7, Article XVIII of the Constitution of Ohio and are an unlawful delegation of the legislative authority of the city of Columbus to an arbitrator.

Counsel for the city argues that the Act must fail if it either violates the home rule provisions of the Ohio Constitution or if its binding arbitration provisions create an unlawful delegation of legislative authority. The appellees, while denying a violation of the home rule provisions of the Constitution, argue that the welfare provision of the Constitution (Section 34, Article II) supersedes the home rule provisions of the Constitution and the Act is in conformity with the welfare provision; thus, the Act is constitutional.

Other than Judge Meagher's decision in *Kettering* v. *SERB* (1984), Montgomery C.P. No. 84-1089, unreported, this is a case of first impression in Ohio. Judge Meagher dismissed the home rule arguments of the city and held that the binding arbitration provisions of R.C. Chapter 4117 are a valid exercise of the legislative function under Section 34, Article II, Ohio Constitution.

This court agrees with Judge Meagher but will address the issues at greater length.

B. Home Rule

Since the Supreme Court's decision in *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 5 O.O. 2d 481, 151 N.E. 2d 722, various cases have held that the limiting language in Section 3, Article XVIII, "as are not in conflict with general laws," deals with police regulations only. See *State, ex rel. Petit,* v. *Wagner* (1960), 170 Ohio St. 297, 10 O.O. 2d 344, 164 N.E. 2d 574, and White, *supra.* Even up to 1980, when the Supreme Court decided *Northern Ohio Patrolmen's Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375, 15 O.O. 3d 450, 402 N.E. 2d 519, the rule of law in Ohio "* * * has been firmly established that the ability to determine the salaries paid to city employees is a fundamental power of local self-government." *Id.* at 383, 15 O.O. 3d at 455, 402 N.E. 2d at 525. Other cases in which wages have been held to be a matter of local self-government are *State, ex rel. Canada, supra; Craig* v. *Youngstown* (1954), 162 Ohio St. 215, 55 O.O.

110, 123 N.E. 2d 19; *Harsney* v. *Allen* (1953), 160 Ohio St. 36, 50 O.O. 492, 113 N.E. 2d 86. However, it should be noted that the Supreme Court also stated in the *Parma* case that "[t]he state's concern in this matter is not sufficient to interfere with the municipalities' fiscal decision as to wages paid to its employees." *Id.* at 383, 15 O.O. 3d at 456, 402 N.E. 2d at 525. Thus, it appears that the court left open the possibility of future statewide interest legislation in the area of wages for municipal employees.

In 1982, the Supreme Court decided *State, ex. rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88, 23 O.O. 3d 145, 431 N.E. 2d 311. In *Moore,* the Chief Justice upheld the state's prevailing wage law (R.C. 4115.03 to 4115.16) against an attack from the city of Upper Arlington. The court held that "[i]t is a fundamental principle of Ohio law that, pursuant to the 'statewide concern' doctrine, a municipality may not, in the regulation of local matters, infringe on matters of general and statewide concern." *Id.* at 89-90, 23 O.O. 3d at 146, 431 N.E. 2d at 312. The court further discussed the question of statewide concern and held at 90-91, 23 O.O. 3d at 146-147, 431 N.E. 2d at 313:

"Applying the foregoing principles to the facts at bar, we conclude, for the reasons that follow, that the General Assembly, in enacting the prevailing wage law, manifested a statewide concern for the integrity of the collective bargaining process in the building and construction trades. Thus, the prevailing wage law preempts and supersedes any local ordinance to the contrary."[4]

It appears to this court, from a review of the Supreme Court's decisions, that the magnitude of the statewide concern can lift what traditionally may have been a matter of local self-government to the level of a police regulation thus exempting it from municipal regulation. See *State, ex. rel. Villari,* v. *Bedford Hts.* (1984), 11 Ohio St. 3d 222, at 224-225, 11 OBR 537, at 538-540, 465 N.E. 2d 64, at 66-67.

There is no doubt that the Ferguson Act was not, prior to 1984, functioning as desired. Further, there is a stated desire by the Ohio Legislature to accomplish the promotion of "orderly and constructive relationships between all public employers and their employees." (R.C. 4117.22.) Preventing police officers from striking and maintaining order in the state of Ohio are matters of statewide concern. Police officers in this state enforce the laws of the entire state, not just municipal ordinances. Thus, this court believes that the binding arbitration provisions of R.C. Chapter 4117 are a matter of statewide concern and, applying the presumption of validity of the Act, the court holds that the arbitration provisions are not violative of the home rule provisions of the Constitution of Ohio.[5]

C. Delegation of Legislative Authority

The city also asserts that the binding arbitration (conciliation) procedure set

---

[4] The *Moore* decision was attacked by the dissenters as being in conflict with *Craig* v. *Youngstown* (1954), 162 Ohio St. 215, 55 O.O. 110, 123 N.E. 2d 19. It is interesting to note that the *Craig* decision held the state's prevailing wage law inapplicable to municipal employees while the *Moore* case held it applicable to non-municipal employees.

[5] Because of this holding, and the holding regarding Section 34, Article II, this court will not discuss the various conflicts within the Charter of the city of Columbus and R.C. Chapter 4117. However, the court has significant concerns with the specificity of the mandated local legislative procedures. For example, the Act provides for a negative vote of city council by a three-fifths majority. (R.C. 4117.14[C][6] requires a departure from the city's chartered procedure.) Was it necessary for the legislature to mandate the local legislative procedure?

forth in the Act is an improper delegation of legislative authority to a non-elected official.

The Supreme Court's most recent pronouncement regarding delegation of legislative authority is found in *Peachtree Development Co.* v. *Paul* (1981), 67 Ohio St. 2d 345, 21 O.O. 3d 217, 423 N.E. 2d 1087. Quoting from *Donnelly* v. *Fairview Park* (1968), 13 Ohio St. 2d 1, 42 O.O. 2d 1, 233 N.E. 2d 500, at paragraph two of the syllabus, the court held at 350, 21 O.O. 3d at 220, 423 N.E. 2d at 1091-1092:

" 'The test for determining whether the action of the legislative body is legislative or administrative is whether the action taken is one enacting a law, ordinance or regulation, or executing or administering a law, ordinance or regulation already in existence.' "

To abdicate the authority to make laws is unconstitutional; however, the authority to execute or administer laws already made can be delegated. See *Green* v. *State Civ. Serv. Comm.* (1914), 90 Ohio St. 252, 107 N.E. 531.

Under many circumstances, it may be difficult to differentiate between making laws and administering them. Administrative agencies in Ohio have the power to make rules and such power has never been held to be unconstitutional. See R.C. Chapter 119; R.C. 119.02 to 119.04. In many instances, the rules adopted by agencies border on the creation of laws. In the case at bar, the conciliator in the binding arbitration procedure has the authority to create wage agreements between employees of the city of Columbus and the FOP. However, the recognized Ohio rule in determining whether the delegation of legislative authority is constitutional is found in *Blue Cross* v. *Ratchford* (1980), 64 Ohio St. 2d 256, 260, 18 O.O. 3d 450,

453, 416 N.E. 2d 614, 618, wherein the Chief Justice wrote:

"We hold that a statute does not unconstitutionally delegate legislative power if it establishes, through legislative policy and such standards as are practical, an intelligible principle to which the administrative officer or body must conform and further establishes a procedure whereby exercise of the discretion can be reviewed effectively. Ordinarily, the establishment of standards can be left to the administrative body or officer if it is reasonable for the General Assembly to defer to the officer's or body's expertise."

In general, other states have upheld binding arbitration public employee statutes when faced with attacks asserting the delegation of legislative functions. Annotation, Validity and Construction of Statutes or Ordinances Providing for Arbitration of Labor Disputes Involving Public Employees (1976), 68 A.L.R. 3d 885. If there is a stated legislative purpose for the administrative officer to follow, and judicial review, binding arbitration for public employees has been held to be the non-delegation of legislative authority. *Id.* The Supreme Court of Michigan, in *Detroit* v. *Detroit Police Officers Assn.* (1980), 408 Mich. 410, 294 N.W. 2d 68, upheld Michigan's public employee binding interest arbitration procedure (which is similar to Ohio's) because there were sufficient standards for the arbitrators to follow; there was a stated legislative purpose; and, there was appropriate judicial review.

The Act in Ohio has a specific stated purpose (R.C. 4117.22); there are sufficient standards for the arbitrator to follow (R.C. 4117.14[G][6] and [7]); and there is appropriate judicial review (R.C. 4117.14[H]).[6]

Thus, the court has determined that

---

[6] This court will admit that the standards in the *Detroit* case, and the method of the appointment of the arbitrator (a panel selected by the board), contain more stringent guidelines than Ohio's procedure. However, this difference does not alter the court's opinion keeping in mind the presumption of the validity of the statutory procedure.

the binding arbitration provisions of the Act do not create an unconstitutional delegation of legislative authority.

D. Welfare Provision of Section 34, Article II

Defendants assert that Section 34, Article II of the Ohio Constitution, because it states that "no other provision of the constitution shall impair or limit this power," takes precedence over all other provisions of the Constitution and all other constitutional arguments of the city. Because of this court's previous holdings, this question need not be answered. However, a logical conclusion would be that Section 34, Article II can be read to override the home rule provisions of the Constitution (Sections 3 and 7, Article XVIII) but not the allegation of impermissible delegation of legislative authority.

The state legislature may, pursuant to Section 34, Article II, pass laws, "fixing and regulating the hours of labor * * * and providing for the comfort, health, safety and general welfare of all employees * * *." In the cases this court cited earlier dealing with municipal employees' wages, Section 34, Article II was rarely mentioned or used as a defense to the attack on the state legislation. Not until 1967 did the Ohio Supreme Court specifically apply Section 34, Article II to municipal employee wage and benefit matters. In *State, ex. rel. Bd. of Trustees of Pension Fund,* v. *Bd. of Trustees of Relief Fund* (1967), 12 Ohio St. 2d 105, 41 O.O. 2d 410, 233 N.E. 2d 135, the Supreme Court held:

"There can be no question that the adopters, the people, intended this section [Section 34, Article II] of the Constitution to apply both to local government and state employees. The cities and towns and other political subdivisions of the state of Ohio constitute en masse one of the largest of the employers in the state. It is our conclusion that the firemen and police of the various localities of Ohio are employees within the scope of this provision. It appears in clear, certain and unambiguous language that no other provision of the Constitution may impair the intent, purpose and provisions of the above section of Article II." *Id.* at 107, 41 O.O. 2d at 411-412, 233 N.E. 2d at 137.

It is interesting to note that the defendants cite the Court of Appeals for Champaign County in *Wray* v. *Urbana* (1982), 2 Ohio App. 3d 172, 2 OBR 188, 440 N.E. 2d 1382; *Vincent* v. *Elyria Bd. of Edn.* (1966), 7 Ohio App. 2d 58, 36 O.O. 2d 151, 218 N.E. 2d 764; and *State, ex. rel. Evans,* v. *Moore, supra,* as authority that Section 34, Article II covers municipal employees. None of these cases was decided on the cited welfare provision. The court of appeals in *Wray* specifically rejected such theory and upheld the questioned law as a matter of statewide concern, thus obviating the necessity for further constitutional validity.

This court is unaware of the reasons for the lack of judicial application of Section 34, Article II. Judge Meagher in *Kettering, supra,* upheld R.C. Chapter 4117 on the basis of Section 34, Article II, and this court agrees with that holding. What more can be a subject of the general welfare of public employees than to have the right to collectively bargain about wages and other conditions of employment?

The defendants allege that the appropriate subjects for bargaining, contained in R.C. 4117.08, go beyond the scope of the general welfare provisions of Section 34, Article II. However, this court believes that what is and is not a proper consideration for the "general welfare" of public employees is up to the legislature to determine within the power granted to it in Article II of the Constitution.

In conclusion, this court holds that R.C. Chapter 4117, as it applies to the binding interest arbitration of employees defined under R.C. 4117.14 (D)(1), does not violate any provisions of the Constitution of Ohio.

### Issuance of a Complaint

The city asserts that SERB lacked jurisdiction to hold a hearing on the complaint because the complaint was not issued by SERB in compliance with R.C. 4117.12(B) and Ohio Adm. Code 4117-7-02(A).

R.C. 4117.12(B) states, in pertinent part:

"When anyone files a charge with the board * * *, the board or its designated agent shall investigate the charge. If the board has probable cause for believing that a violation has occurred, the board shall issue a complaint and shall conduct a hearing concerning the charge.* * *"

It is stipulated that the complaint issued in this case was not signed by an individual member of SERB but by its Executive Director, Kenneth W. Barrett, who was properly appointed pursuant to R.C. 4117.02(E).

There is nothing in the record to show that Barrett did not have the authority to act on behalf of the board in the perfunctory function of acting as signatory of the complaint. In fact, the record reflects that the issuance of the complaint was approved by all members of the board and was signed by Barrett with the express approval and by direction of the board. The Ohio Supreme Court in *McKenzie* v. *Racing Comm.* (1966), 5 Ohio St. 2d 229, 232, 34 O.O. 2d 463, 465, 215 N.E. 2d 397, 400, held that an administrative agency's employee's signature was a "sufficient certification" for purposes of a statutory requirement for the commission to certify the record.[7]

Thus, the court holds that the complaint was properly issued by SERB and SERB had jurisdiction of the case.

### Can the Fact-Finding Process be Circumvented by SERB?

The transcript of the SERB proceedings, and the statement of facts, are replete with discussions and confusion as to the interpretation of the city contract in light of the newly created Act. Neither party, nor the board, had adequate legal and practical guidance for the parties prior to the February 6, 1985 order and opinion of SERB. In the opinion, SERB held at 4:

"Under normal conditions this would require SERB to assist fact finding procedures i.e., submit a list to the parties for alternative striking (R.C. 4117.14(C)(3); [Ohio Adm. Code] Rule 4117-9-05). However, the impasse time points came and went without Board action. But in this case SERB had no obligation to submit a list. For the respondent had indicated unequivocally that if it felt it had a superseding MAD [Mutual Alternative Dispute Settlement Process] to which it intended to adhere without variance."

The hearing officer continued in his findings by quoting written communication and testimony of the city which led him to the conclusion that the "law does not mandate obvious futility."

After reviewing the record, this court finds that the conclusion of the hearing officer regarding the futility of the suggested order for fact-finding is not supported by substantial evidence. See R.C. 4117.14(B).

R.C. 4117.18(B) contains a prohibition that "[n]o person shall purposely refuse to obey a lawful order of the state employment relations board * * *."[8] Nothing in the record indicates that the city would not comply with an order of SERB issued pursuant to R.C. 4117.14 (C)(3). In addition, this court finds that

---

[7] Subsequent action by SERB which is the subject of this appeal can be considered ratification of the action of the executive director in the issuance of the complaint.

[8] Even though R.C. 4117.18(B) does not contain a penalty section, it is assumed that its order can be enforced through action of the common pleas court.

the statutory fact-finding procedure is an integral part of the Act and cannot, and should not, be circumvented under any circumstances. The fact-finding procedure is intended to lead to a final resolution of the dispute. It is possible, and is anticipated by the Act, that submission to the fact-finding panel's recommendation could result in an agreement unless rejected by either party.

If SERB had the authority to make a factual determination that adherence to the mandatory portions of the Act[9] were an "obvious futility," then statewide consistency could not be maintained and the Act would not effectuate its purpose by sidestepping the step-by-step conciliation procedures.

Thus, the court finds that fact-finding should have been ordered by the board pursuant to R.C. 4117.14(C)(3).

### Did the Board Err in Determining that the Parties Have Failed to Agree on a Mutual Alternative Dispute Settlement Process (MAD)?

R.C. 4117.14(E) provides in part:

"Nothing in this section shall be construed to prohibit the parties, at any time, from voluntarily agreeing to submit any or all of the issues in dispute to any other alternative dispute settlement procedure.* * *"

The stipulated Collective Bargaining Agreement in effect between the city and the FOP from October 1, 1982 to September 30, 1984, provides in Section 2, Article XXX:

"Either party may, at any time during the period beginning September 15, 1984, and including October 15, 1984, upon written notice to the other party, institute a mediation request with the Columbus Office of the Federal Mediation and Conciliation Service (F.M.C.S.).

Should the F.M.C.S. agree to assist the parties upon this unilateral request of either party, the other party agrees to fully participate in any and all mediation sessions called by the F.M.C.S. Nothing herein shall preclude the parties from requesting the mediation services of the F.M.C.S. at any time upon mutual agreement to do so."

The city argues that the Collective Bargaining Agreement of the parties creates a MAD which exempts it from the mandatory provisions of the Act. However, the city has not explained to the court what the provision of the contract means. If this provision is a MAD, is the city totally exempt from fact-finding and binding conciliation if mediation fails? Does mediation under the city's contract stay enforceability of the Act for an indefinite period of time until an impasse is declared by both parties? Mediation can be refused by F.M.C.S. If the F.M.C.S. refuses, is it still a MAD?

It is this court's opinion that the MAD contemplated by R.C. 4117.14(E) should include procedures that lead to a final resolution of the dispute.[10] In addition, this court is of the belief that it is possible for parties to agree on a nonbinding mediation procedure that could be construed as a "statutory MAD" if the Act was contemplated at the time of the adoption of the contract *and* provisions were made for an impasse procedure. In the case at bar, neither of the above is true.

Thus, the court finds that Article XXX of the Collective Bargaining Agreement with the city and the FOP does not create an "alternative dispute settlement procedure" contemplated by R.C. 4117.14(E), and the opinion of SERB in this regard is supported by substantial evidence.

---

[9] "* * * the board *shall* appoint within one day a fact-finding panel * * *." R.C. 4117.14(C)(3). (Emphasis added.)

[10] Non-binding mediation and/or conciliation is contemplated by the Act prior to impasse.

### Are Public Safety Officers "Members of a Police Department" Under R.C. 4117.14(D)(1)?

This court has set forth the applicable provisions of R.C. 4117.14(D)(1) and 4117.01(M) which deal with "members of a police department." It is this court's belief that the legislature did not attempt to define with specificity all conceivable police functions when it exempted members of a police department from the permissible strike provisions of the Act. Considering that the Act must be liberally construed to effectuate its purpose (R.C. 4117.22), the legislature determined that traditional safety forces should not be permitted to strike. It is stipulated by the parties that the Public Safety Officers ("PSO's") of the city of Columbus enforce state and municipal laws within their limited assigned areas (airport, waterways, zoo and parks). It is also undisputed that PSO's wear police uniforms, carry weapons on duty, are certified by the Ohio Peace Officers Training Council, are under the direct command of the Chief of Police of the city of Columbus, Department of Public Safety, and are appointed from a duly established civil service eligibility list.

The obvious intent of the legislature is to prohibit strikes which could disturb vital safety services affecting the life and property of the citizens of Ohio. PSO's in Columbus perform regular police functions within the territorial jurisdiction to which they are assigned. The life and property of the state's citizens and visitors are equally as important at the airport, the rivers, the zoo, and in the parks as they are on the streets of our state.

Thus, the court holds that Public Safety Officers of the city of Columbus are "members of a police department" under R.C. 4117.14(D)(1), and the finding of the hearing officer in this regard is supported by substantial evidence.

### Did the Board Have Authority to Issue its Order Effective Retroactively to December 31, 1984?

R.C. 4117.14(G)(11) sets forth SERB's authority with respect to the effective date of any award issued by a conciliator:

"Increases in rates of compensation and other matters with cost implications awarded by the conciliator may be effective only at the start of the fiscal year next commencing after the date of the final offer settlement award; provided that if a new fiscal year has commenced since the issuance of the board order to submit to a final offer settlement procedure, the awarded increases may be retroactive to the commencement of the new fiscal year.* * *"

Without any justification for its findings and order, SERB ordered "the order incorporating these mandates is effective as though issued on December 31, 1984, and all cost items, if any, shall be effective retroactive to that date." The court agrees with counsel for SERB when he states that "the Board has the clear authority to order retrospective relief to put the parties in their rightful places. The Board's fashioning of discretionary relief is entitled to great deference."

However, such retrospective authority is controlled and limited by the appropriate legislation which granted the authority to SERB. Since the board's authority with respect to retrospective relief is limited to "the commencement of the new fiscal year * * *," the order should have read "as though issued on January 1, 1985."

Thus, the court finds that the order of SERB, retroactive to December 31, 1984, is not supported by substantial evidence.

The parties should note that R.C. 4117.14(G)(11) is not self-executing and is triggered *after* a conciliator has completed the impasse procedure. It is the conciliator who is to make the retroac-

tive decision, not SERB prior to conciliation. Since this court will be remanding the case to SERB for action consistent with this opinion, this part of the decision is moot. The effective date of the contract is a matter to be conciliated and SERB does not have the authority to tie the hands of the conciliator prior to his hearing process.

## Conclusion

The court will remand the case to SERB with instructions that the statutory impasse procedure contained in R.C. 4117.14(C)(3) must be complied with prior to the commencement of binding conciliation. In addition, the court will further direct SERB that it is not to instruct the conciliator as to the effective date of awarded compensation; and specifically, no awarded compensation of the conciliator is to be effective prior to January 1, 1985.

(No. 85CV-02-797—
Decided March 19, 1985.)

ON MOTION TO VACATE

CRAWFORD, J. On March 8, 1985, this court issued a decision which set forth certain enumerated findings of fact and conclusions of law. Subsequent to that decision, the city of Columbus filed a "Motion to Vacate Decision and for Judgment in Favor of the City of Columbus." Defendants have filed memoranda contra the city's motion and have requested the court to expand on its decision as a result of questions that have arisen as a result of the decision. Normally, a court will not expand upon its decision because of questions that are created as a result of the decision. However, this court feels that direction to SERB (and to the court of appeals, if necessary) should be as clear as possible considering the importance of the dispute to the parties and the community as a whole.

In essence, the questions that have been raised by the decision are as follows:

(1) Did the court find that the city engaged in an unfair labor practice?

(2) Did the court hold that SERB's finding that "the order incorporating these mandates is effective as though issued on December 31, 1984 * * *" was an improper order?

Inherent in the court's opinion was a finding that there was substantial evidence to support SERB's determination that the city engaged in an unfair labor practice by insisting on the use of Section 2, Article XXX of the Collective Bargaining Agreement in effect between the FOP and the city from October 1, 1982. The court held that the city's position with respect to the MAD was not a proper position. The court further found that the findings of the hearing officer regarding the "obvious futility" of ordering fact-finding was not supported by substantial evidence. Thus, the court did find that an unfair labor practice, which was the basis of SERB's order, was proper, but such decision of SERB did not support a bypass of fact-finding.

The court never made a finding regarding SERB's authority to issue retroactive findings of an unfair labor practice. The court did hold that SERB had no authority to direct a conciliator regarding "cost items." The issue of SERB's authority to make retroactive findings regarding an unfair labor practice was not assigned by the city as error.[11] The city did argue regarding the issuance of back pay awards but not the effective date of the unfair labor practice finding. The court has construed paragraph "(d)" of the order and opinion to be two separate and distinct statements: (1) the effective date of the order is December 31, 1984; and, (2) the con-

---

[11] In fact, the city never raised as an assignment of error SERB's finding of an unfair labor practice against the city.

ciliator is directed to make all cost items effective retroactive to December 31, 1984.

The court found that SERB had no power to direct the conciliator (or factfinder) with respect to any issue that is the subject for collective bargaining (R.C. 4117.08). Further, the court stated, by way of dicta, that assuming the order was effective December 31, 1984, the conciliator would have no authority to issue retroactive cost items prior to January 1, 1985 — the new fiscal year next commencing after the "effective date" of the board's order. R.C. 4117.14(G)(11).

Pursuant to R.C. 4117.12(B)(2) and (3), SERB has the authority to issue an order "effective as therein prescribed." Further, SERB has the authority, pursuant to R.C. 4117.12(B)(4), to issue back pay awards to employees who may have been discriminated against as a result of an unfair labor practice. Thus, this court finds that SERB had authority to make its findings of an unfair labor practice to an effective date prior to the issuance of the order.

As a result of this decision, the parties will ask the question as to whether the language contained in R.C. 4117.14 (G)(11) limits the authority of a conciliator to issue an award which is retroactive to the *effective date* of the order if such effective date is prior to the release date of the order? The pertinent part of R.C. 4117.14(G)(11) refers to a new fiscal year "* * * since the *issuance* of the board order * * *." (Emphasis added.) Whether the effective date and the issuance date are the same is not presently before this court. Neither SERB nor this court has the authority to direct the conciliator regarding the issue of retroactivity. This is a matter to be resolved through the dispute settlement procedure. Regardless of what may ultimately be awarded by the conciliator, the award will be subject to review by this court pursuant to the provisions of R.C. 4117.14(H), and no advisory opinion should, or will, be issued on this question.