613 A.2d 522

LOCAL 22, PHILADELPHIA FIRE FIGHTERS' UNION, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL–CIO, By Its Trustee Ad Litem, Les YOST

and

Lodge No. 5, Fraternal Order of Police, By Its Trustee Ad Litem, John Shaw, Petitioners,

v.

COMMONWEALTH of Pennsylvania, the Pennsylvania Intergovernmental Cooperation Authority, and Bernard Anderson, Carol Gassert, John J. Egan, Handsel B. Minyard, Charles L. Andes, Stephen Mullin, Michael Herschock, Members of the Governing Board of the Pennsylvania Intergovernmental Cooperation Authority, and the City of Philadelphia, Respondents.

DISTRICT COUNCIL 33, AMERICAN FEDERATION of STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, By Its Trustee Ad Litem James SUTTON,

and

District Council 47, American Federation of State, County and Municipal Employees, AFL–CIO, by Its Trustee Ad Litem, Thomas P. Cronin, Petitioners,

v.

COMMONWEALTH of Pennsylvania, the Pennsylvania Intergovernmental Cooperation Authority, and Bernard Anderson, Carol Gassert, John J. Egan, Handsel B. Minyard, Charles L. Andes, Stephen Mullin, Michael Herschock, Members of the Governing Board of the Pennsylvania Intergovernmental Cooperation Authority, and the City of Philadelphia, Respondents.

Supreme Court of Pennsylvania.

Argued April 7, 1992.

Filed June 17, 1992.

336

Stuart W. Davidson, Philadelphia, for Philadelphia Fire Fighters' Union, Intern. Ass'n of Fire Fighters.

John K. Weston, Philadelphia, for Fraternal Order of Police.

Robert F. Williams pro hoc vice.

Michael L. Browne, Carl E. Singley, Philadelphia, for The Pennsylvania Intergovernmental Co op. Authority.

Anne K. Fiorenza, Deputy Atty. Gen., Judith E. Harris, Acting City Sol., for respondents.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This action, addressed to the original jurisdiction of this court,[1] challenges the constitutionality of Act 6, 53 P.S. § 12720.101 et seq. (Supp.1991), the Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class, and the legality of the agreement entered into pursuant to Act 6 between the Pennsylvania Intergovernmental Cooperation Authority and Philadelphia. This action is brought by the Philadelphia Fire Fighter's Union, the Fraternal Order of Police, and the American Federation of State, County and Municipal Employees, AFL–CIO ("the unions").

Essentially, Act 6 is born of the General Assembly's recognition that cities of the first class are in dire financial difficulty.[2] The act creates a special agency of government, the

1. Act 6, § 702, 53 P.S. § 12720.702, provides:
   The Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of this act, the contractual rights of the parties relating to bonds issued pursuant to this act.…

2. Legislative findings are as follows:
   It is hereby determined and declared as a matter of legislative finding:
   1. That cities of the first class have encountered recurring financial difficulties which may affect the performance of necessary municipal services to the detriment of the health, safety and general welfare of residents of such cities.
   2. That the financial difficulties have caused cities of the first class to lose an investment-grade credit rating and direct access to capital markets.
   3. That it is critically important that cities of the first class achieve an investment-grade credit rating and thereafter maintain their creditworthiness.
   4. That, without the ability to enter the capital markets, cities of the first class may face a fiscal emergency that could render them unable to pay their obligations when due and deliver essential services to their citizens.
   5. That, due to the economic and social interrelationship among all citizens in our economy, the fiscal integrity of cities of the first class is a matter of concern to residents of the entire Commonwealth, and

Pennsylvania Intergovernmental Cooperation Authority ("the authority") composed of financial experts, to assist cities of the first class in extricating themselves from financial difficulties.[3]

the financial problems of such cities have a direct and negative effect on the entire Commonwealth.

6. That, because cities of the first class consume a substantial proportion of the products of Pennsylvania's farms, factories, manufacturing plants and service enterprises, economic difficulties confronting cities of the first class detrimentally affect the economy of the Commonwealth as a whole and become a matter of Statewide concern.

7. That, because residents of cities of the first class contribute a substantial proportion of all Commonwealth tax revenues, a disruption of the economic and social life of such cities may have a significant detrimental effect upon Commonwealth revenues.

8. That cities of the first class and the Commonwealth have shown a willingness to cooperate in order to address important financial and budgetary concerns.

9. That the financial difficulties of cities of the first class can best be addressed and resolved by cooperation between governmental entities.

10. That the Constitution of Pennsylvania grants municipalities authority to cooperate with other governmental entities in the exercise of any function or responsibility.

11. That the Commonwealth retains certain sovereign powers with respect to cities of the first class, among them the powers to authorize and levy taxes, to authorize the incurring of indebtedness and to provide financial assistance that may be necessary to assist cities in solving their financial problems.

12. That the Commonwealth may attach conditions to grants of authority to incur indebtedness or assistance to cities of the first class in order to ensure that deficits are eliminated and access to capital markets is achieved and maintained.

13. That such conditions shall be incorporated into intergovernmental cooperation agreements between the Commonwealth or its instrumentalities and cities of the first class.

14. That cities of the first class and the Commonwealth will benefit from the creation of an independent authority composed of members experienced in finance and management which may advise such cities, the General Assembly and the Governor concerning solutions to fiscal problems cities of the first class may face.

Act 6, § 103, 53 P.S. § 12720.103.

3. A partial synopsis of Act 6 provides that the Intergovernmental Cooperation Authority Act for Cities of the First Class is:

An act providing for the financial stability of cities of the first class; establishing an authority empowered to assist cities of the first class in their financial affairs and to issue findings and recommendations to cities of the first class and to the General Assembly; creating the authority and providing for its powers and duties; authorizing each city of the first class and the authority to enter into intergovernmental

The act empowers the authority to enter into "intergovernmental cooperation agreements" with a city, which agreements, in general terms, are designed to provide financial assistance to cities and to provide access to capital markets, in return for which the cities agree to certain financial plans and restraints which are appropriate for the type of help which the authority proposes to offer.

The unions which have brought this action are concerned that Act 6 is unconstitutional and that the agreement between the authority and Philadelphia is unlawful. For the reasons that follow, we have determined that Act 6 is constitutional and that the agreement entered into between the authority and Philadelphia is valid.

The unions' first claim, which arises in the context of a quo warranto action,[4] is that Act 6 is void and unenforceable because the Pennsylvania Intergovernmental Cooperation Authority Board (PICA Board) is unconstitutionally appointed. Specifically, the infirmity complained of is that four of the five voting members of the PICA Board are appointed by and serve at the pleasure of legislators, while only the fifth is appointed by the governor. Such an arrangement, according

cooperation agreements and specifying certain terms of such agreements and ordinances whereby cities of the first class enter into such agreements; empowering the authority to incur indebtedness, receive revenues, acquire the obligations of assisted cities, make loans and offer other financial assistance to such cities subject to conditions; establishing procedures for the preparation and review of financial plans of cities of the first class while bonds of the authority are outstanding and providing remedies for failure to adhere to such plans; requiring certain contracts to be consistent with the financial plan....

4. In *Spykerman v. Levy*, 491 Pa. 470, 484–85, 421 A.2d 641, 648 (1980), this court described the action of quo warranto as follows:

Historically, Pennsylvania Courts have held that the quo warranto action is the sole and exclusive method to try title or right to public office.... Title cannot be tested by mandamus ... injunction ... or any other proceeding that is provided for by the common law.... A *quo warranto is addressed to preventing a continued exercise of authority unlawfully asserted*, rather than to correct what has already been done under the authority.... The gravamen of the complaint is the right to hold and exercise the powers of the office in contradistinction to an attack upon the propriety of the acts performed while in office.

to the unions, violates the separation of powers doctrine, Art. II, Sec. 1; Art. IV, Sec. 2, Pa. Const., in that the board's essentially executive powers are controlled by the legislative branch of government.

■ In addressing this and the unions' other claims of constitutional infirmity, we must observe at the outset that our review is based upon the strong presumption of constitutionality which accompanies any duly enacted legislation. As this court stated in *Commonwealth v. Parker White Metal Co.*, 512 Pa. 74, 82, 515 A.2d 1358, 1362 (1986), there is a strong and fundamental presumption that the legislature has acted properly and within constitutional bounds, and legislation will not be deemed unconstitutional unless it clearly, plainly and palpably violates some specific mandate or prohibition of the constitution. Additionally, with respect to the first claim, we must address the unions' standing to sue in quo warranto.

■ In general, quo warranto actions are brought by the Attorney General or the district attorney, *Spykerman*, 491 Pa. at 485, 421 A.2d at 649, and a private person may not bring a quo warranto action when he has no individual grievance. In *Snider v. Thornburgh*, 496 Pa. 159, 436 A.2d 593 (1981) this court addressed the standing requirements for a quo warranto action which is brought by individuals other than the Attorney General or the district attorney. *Snider* involved claims by certain elected school directors that the Public Officials Ethics Law was unconstitutional. The Ethics Law proscribed certain conduct of public officials and required these officials to file financial disclosure statements. Among the challenges made by the school directors was a count in quo warranto, which challenged the manner in which Ethics Commission members were appointed. We stated:

For a party to have standing to sue, several requisites must be satisfied.

"The core concept . . . is that a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge. In particular it is not

sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law." . . .

These appellants do not argue to us any interest beyond that shared in common by all citizens. Appellants do not contend the mere existence of the Ethics Commission injures them, although they do, of course, challenge other portions of the Act. Appellants do not argue that their duties or obligations have in any fashion been compounded or their rights or privileges in any way diminished by the appointment of the presently sitting commission members. Their complaint is merely that the appointments were not made in accordance with the law. The interest so pleaded is no different in quality or quantity than that shared by the citizenry in general.

Additionally, standing to sue requires that the interest asserted be not only substantial, but also "direct," *that is, "the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains."* . . . *Appellants have not attempted to demonstrate how the injury allegedly caused them by the terms of the Act has in turn been caused by the Governor's appointment of commission members without confirmation.*

496 Pa. at 174–175, 436 A.2d at 600. (Emphasis added.) In the present case, very much as in *Snider,* the unions have not demonstrated how their interests are affected by the allegedly unconstitutional means by which PICA Board members are appointed. The first claim must be denied, therefore, for the unions have no standing to bring a quo warranto action challenging the manner in which the PICA Board is appointed.

■ The unions' second claim is that the authority created by Section 201 of Act 6 constitutes a "special commission" to which the General Assembly has delegated authority to intervene in the affairs of the city in violation of Art. III, Sec. 31 of the Pennsylvania Constitution.

Art. III, Sec. 31 of the Pennsylvania Constitution provides: The General Assembly shall not delegate to any special commission, private corporation or association, any power to

make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or to perform any municipal function whatever.

This section, however, must be interpreted in the context of other applicable sections of the constitution, viz., Art. IX, sec. 5:

*A municipality* by act of its governing body *may*, or upon being required by initiative and referendum in the area affected shall, *cooperate or agree in the exercise of any function, power or responsibility* with, *or delegate or transfer any function, power or responsibility to, one or more other governmental units* including other municipalities or districts, the Federal government, any other state or its governmental units, or any newly created governmental unit.

(Emphasis added.)

The General Assembly in Act 6 has not delegated any power to the authority to interfere in municipal government. It has, to the contrary, empowered the agency only to enter into cooperative agreements with cities of the first class *which request assistance.* It is the city requesting assistance, therefore, which *voluntarily* enters into an agreement with the authority, for the authority cannot impose its imperial will upon a hapless city. Further, the assisted city plainly has the power to enter into such agreements under Art. IX, sec. 5. The claim that Act 6 and the agreement between the authority and Philadelphia are in violation of Art III, sec. 31 of the Pennsylvania Constitution is without merit.

■ Next, the unions claim that section 209(k) of Act 6, which purports to amend Act 111 so that fire and police interest arbitrations are no longer binding, is unconstitutional under the second clause of Art. III, sec. 31 of the Pennsylvania Constitution.

Section 209(k) of Act 6 provides:

(3)(i) Any party to a proceeding before a board of arbitration may appeal to the court of common pleas to review:

(A) the consideration of the assisted city's financial plan;

(B) the determination as to the assisted city's financial ability to pay; or

(C) the failure of the board of arbitration to issue a determination, including a detailed writing of all factors which the board of arbitration took into account in considering and giving substantial weight to the assisted city's financial ability to pay and the assisted city's financial plan.

(ii) the decision of the board of arbitration shall be vacated and remanded to the board of arbitration if the court finds:

(A) that the board of arbitration failed to take into consideration and accord substantial weight to the approved financial plan;

(B) that the board of arbitration's determination as to the assisted city's financial ability to pay is not supported by substantial evidence as produced by the parties to the proceedings before the board of arbitration; or

(C) that the board of arbitration has failed to state with specificity in writing the factors which it took into account in considering and giving substantial weight to the assisted city's financial ability to pay or the assisted city's approved financial plan.

(iii) Such appeal shall be commenced not later than 30 days after the issuance of a final determination by the board of arbitration.

(iv) If, after the exhaustion of all appeals, the final arbitration award is not in compliance with the approved financial plan, the award shall not be void or voidable solely by reason of such noncompliance, but the assisted city shall submit to the authority a proposed revision to the plan which demonstrates that revenues sufficient to pay the costs of the award will be available in the affected fiscal years of the plan.

Act 6, sec. 209(k)(3).

The second clause of Art. III, sec. 31, Pa. Const., which purportedly invalidates Act 6, provides:

Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly *may enact laws* which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate Officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth, with respect to matters which require legislative action, to take the action necessary to carry out such findings.

Art. III, sec. 31, Pa. Const. (Emphasis added.) The unions complain that the effect of Act 6 will be to provide the interference of a third party (the court) in arbitration proceedings which, prior to Act 6, under Act 111, 43 P.S. §§ 217.1–217.10, were generally not subject to judicial review. Undoubtedly, the unions are correct in stating that arbitration awards under Act 6 will be treated differently than under the terms of Act 111, but that is not the issue. The issue is whether Act 6 is unconstitutional because it violates the terms of Art. III, sec. 31. Plainly, it is not. Art. III, sec. 31 provides that the General Assembly *may* enact laws which provide for binding arbitration in labor disputes between police and firemen and their public employers. Art. III, sec. 31 does not *require* the General Assembly to enact such laws, and insofar as Act 6 modifies Act 111, to permit judicial review of collective bargaining arbitration awards, such modification is not prohibited by Art. III, sec. 31. This claim is without merit.

Finally, the unions claim that section 5.07 of the intergovernmental cooperation agreement is invalid because it conflicts with protected collective bargaining rights under Act 195, the Public Employee Relations Act, 43 P.S. § 1101.101 *et seq.,* and Act 6. More specifically, the claim is that section

5.07(b)[5] frustrates the collective bargaining process "by requiring that the City demonstrate to the Authority's satisfaction that any Collective Bargaining Agreement reached through negotiations can be funded in accordance with any necessary revisions to the Financial Plan. . . . Simply put, the Authority has the power to dictate the City's bargaining posture through a none-too-subtle economic coercion. Such an exercise of power by a third-party to negotiations constitutes a violation of the good faith bargaining requirement of Act 195." Union Brief at 74–75. Section 5.07(c)[6] allegedly conflicts with the bargaining process as mandated by Act 195 by requiring that the city accommodate its collective bargaining posture to the views of the authority.

Section 5.07(b) of the agreement simply provides that after the city drafts a financial plan approved by the authority, the

**5.** Section 5.07(b) provides:
(b) After the approval by the Authority of a Financial Plan submitted pursuant to the Act and this Agreement, the City shall execute collective bargaining agreements in compliance with such Financial Plan. If the City executes a collective bargaining agreement, or receives an arbitration award (other than an arbitration award covered by Section 5.08 hereof, as to which the provisions of Section 5.08 shall apply), which is not in compliance with such Financial Plan, neither such collective bargaining agreement nor such arbitration award shall be void or voidable solely by reason of such noncompliance, but the City shall as soon as practicable (but in no event later than fifteen (15) Days after the execution by the City of such collective bargaining agreement or receipt by the City of such arbitration award) submit to the Authority a proposed revision to the Financial Plan which demonstrates to the reasonable satisfaction of the Authority that revenues sufficient to pay the costs of such collective bargaining agreement or such arbitration award, as the case may be, will be available in the affected fiscal years of the Financial Plan.

**6.** 5.07(c) provides:
(c) In negotiating collective bargaining agreements in accordance with Section 5.07(b) hereof, the City shall consider any Authority views concerning the financial impact on the City. The City will provide to the Authority any information requested by the Authority to assist the Authority in anticipating the manner in which proposed labor agreements will comply with the Financial Plan then in effect. Without limiting the requirements of Section 5.07(b) hereof, the City shall, within fifteen (15) Days after execution of a collective bargaining agreement or receipt of an arbitration award, provide to the Authority a report in writing on the effect of such agreement or award on the Financial Plan.

city shall follow sound financial practices and execute collective bargaining agreements in compliance with its financial plan. If it does not, the city must then submit to the authority a revised financial plan which demonstrates to the satisfaction of the authority that there is sufficient revenue to pay the costs of the agreement.

Section 5.07(c) of the agreement provides that when the city negotiates collective bargaining agreements, it shall consider the views of the authority with respect to how a proposed collective bargaining agreement may affect the financial plan, provide information which the authority requests on the proposed collective bargaining agreement, and after it enters into the collective bargaining agreement, submit to the authority a report on the effect of the collective bargaining agreement on the financial plan.

In sum, paragraphs 5.07(b) and (c) of the intergovernmental cooperation agreement cited above merely provide that the city must consider the views of the authority, that it must report on the impact of any completed collective bargaining agreement on the financial plan, and that it must explain to the authority how it will pay the costs of the labor contract if they exceed what was agreed to with the authority. These requirements do not impede the ability of the city to negotiate its own collective bargaining agreements. In fact, the city is free to negotiate a collective bargaining agreement which violates the financial plan, if it demonstrates how it can pay the increased costs. Neither of these intergovernmental cooperation agreement provisions is invalid, for neither prevents the city from negotiating collective bargaining agreements in good faith.

■ Moreover, the agreement does not violate Act 6. The purpose of Act 6, as stated in section 203, is to assist cities in solving their fiscal problems and help them achieve and maintain access to capital markets. Section 203 gives the authority the power "to assist cities in achieving financial stability *in any manner* consistent with the *purposes* and *powers* described by this act." (Emphasis added.)

If the purpose of the act is to promote financial stability of the cities, it is consistent with that purpose to permit the authority to monitor the cities adherence to the financial plan.

As to the powers of Act 6, section 209(j) specifically provides that an assisted city must submit a revised financial plan if it should enter into any collective bargaining agreement which is not in accord with the financial plan. Section 209(j) of Act 6 states:

(2) After the approval by the authority of a financial plan submitted pursuant to this section, an assisted city shall execute contracts and collective bargaining agreements in compliance with such plan. If a city executes a contract or a collective bargaining agreement which is not in compliance with the plan, the contract or agreement shall not be void or voidable solely by reason of such noncompliance, but the city shall submit to the authority a proposed revision to the plan which demonstrates that revenues sufficient to pay the costs of the contract or collective bargaining agreement will be available in the affected fiscal years of the plan.

The intergovernmental cooperation agreement does no more than facilitate the statutory mandate that the collective bargaining agreement be in accord with the financial plan or a revised, approved, plan. The intergovernmental cooperation agreement, therefore, is consistent both with the purpose and the powers of Act 6, which alters, to some extent, the nature of collective bargaining under Act 195.

It would be anomalous, indeed, if the Pennsylvania Constitution were to prevent the legislature from assisting financially distressed cities. A city which seeks the authority's help is, by definition, financially distressed. Act 6 does no more than offer help which the city is unable to provide for itself and create an agency of government to make the city live up to the financial plans which it agreed to.

For the foregoing reasons, it is our determination that Act 6 is constitutional and that the agreement between the authority and the City of Philadelphia is valid and lawful.

LARSEN, J., did not participate in the consideration or decision of this case.

348

ZAPPALA, J., did not participate in the decision of this case.

PAPADAKOS, J., did not participate in the decision of this case.

CAPPY, J., did not participate in the decision of this case.