FRATERNAL ORDER OF POLICE,
LODGE NO. 165, Appellant,

v.

CITY OF CHOCTAW, Oklahoma,
Appellee.

INTERNATIONAL UNION OF
POLICE ASSOCIATIONS,
LOCAL 24, Appellant,

v.

CITY OF LAWTON, Oklahoma,
A Municipal Corporation,
Appellee.

Richard FERLING, President of Fraternal Order of Police, Lodge 136 of Edmond, Oklahoma, and Fraternal Order of Police, Lodge 136 of Edmond, Oklahoma, an Oklahoma nonprofit corporation, Petitioners,

v.

CITY OF EDMOND, Oklahoma,
a municipal corporation,
Respondent.

Nos. 85460, 85542 and 85266.

Supreme Court of Oklahoma.

July 9, 1996.

As Corrected July 11, 1996.

Rehearing Denied Jan. 22, 1997.

As Corrected Jan. 27, 1997.

James R. Moore, William F. Comstock, Horning, Johnson, Grove, Moore, Hulett & Thompson, Oklahoma City, for Appellant Fraternal Order of Police Lodge No. 165.

Ted Pool, Sherry Blankenship, Pool, Blankenship, Vincent & Love, Oklahoma City, for Appellee City of Choctaw, Oklahoma.

Diane Pedicord, Sue Ann Nicely, Oklahoma City, for Amicus Curiae Oklahoma Municipal League, Inc.

John H. Vincent, Senior Asst. City Attorney, Lawton, for City of Lawton, Oklahoma.

Nancy Nichols, City Clerk, Stephen T. Murdock, Municipal Attorney, Edmond, for City of Edmond, Oklahoma.

SUMMERS, Justice:

This Court is once again faced with the question of whether a recently enacted section of the Fire and Police Arbitration Act is constitutional. At issue is 11 O.S.Supp.1994, § 51–108, which in effect mandates binding interest arbitration. Because three cases pending in this Court involve the constitutionality and application of this section, we have made them companion cases. We now uphold the constitutionality of the challenged provision as written, although we observe that an unconstitutional application of it could occur in practice.

The statute is as follows:

§ 51–108. Hearing procedures—Special municipal elections—Effective Date of Agreements

A. 1. The arbitration board acting through its chairman shall call a hearing to be held within ten (10) days after the date of the appointment of the chairman and shall, acting through its chairman, give at least seven (7) days' notice in writing to each of the other two arbitrators, the bargaining agent and the corporate authorities of the time and place of such hearing.

2. At least seven (7) days before the date of the hearing *the corporate authorities and the bargaining agent shall submit to each other and to the arbitration board members a written arbitration statement* listing all contract terms which the parties have resolved and all contract issues which are unresolved. *Each arbitration statement shall also include a final offer on each unresolved issue.* The terms and offers contained in the arbitration statements shall be known collectively as each parties' *last best offer.*

3. The hearing shall be informal and the rules of evidence prevailing in judicial proceedings shall not be binding. Any and all documentary evidence and other data deemed relevant by the arbitrators may be received in evidence. The arbitrators shall have the power to administer oaths and to require by subpoena the attendance and testimony of witnesses, the productions of books, records, and other evidence relative or pertinent to the issues presented to them for determination. A hearing shall be concluded within twenty (20) days from the time of commencement.

4. Within seven (7) days after the conclusion of the hearing, *a majority of the arbitration board members shall select one of the two last best offers as the contract of the parties.* The criteria to be used by the board in determining which offer to select shall be limited to paragraphs 1 through 5 of Section 51–109 of this title. The arbitration board may not modify, add to or delete from the last best offer of either party. Written notice of the selection decision shall be mailed or delivered to bar-

gaining agent and the corporate authorities.

B. *If the city's last best offer is not selected by the arbitration board, that party may submit the offers which the parties submitted to the arbitration board to the voters of the municipality for their selection by requesting a special election* for that purpose. The request for an election must be filed with the clerk of the municipality within ten (10) days of the date of the written decision of the arbitration board. Written notice of the filing of the request shall be given to the bargaining agent. if a request for an election is not filed in a timely manner, the board's selection decision shall be final, and the last best offer it selected shall constitute the agreement of the parties.

C. Upon receiving a request for an election pursuant to the provisions of this section the clerk shall notify the mayor and governing body of the request. Within ten (10) days of such notification the municipal authorities shall call for a special election. The election shall be governed by the state laws on special municipal election except that only a minimum of thirty (30) days' notice shall be required to be given to the county election board conducting said election. Only residents of the municipality shall be eligible to vote in said election. The ballot shall inform the voters that they must choose either the last best offer of the bargaining agent or the last best offer of the corporate authorities. *The last best offer receiving a majority of the votes shall become the agreement of the parties.*

D. Concerning issues relating to money, such ballot shall clearly state the total dollar amount of the offer from the corporate authority and the total dollar amount of the offer from the bargaining agent. Such ballot shall also disclose the percentage of increase or decrease both offers have over or under the last contract of the two parties.

E. Agreements which are reached as a result of selection by the arbitration board or by election shall be effective on the first day of the fiscal year involved regardless of the date of the final selection.

(Emphasis added)

### Ferling v. City of Edmond

The first case, *Richard Ferling v. City of Edmond,* No. 85266, 1996 WL 383263 (1996) is an application by Petitioner as President of the local Fraternal Order of Police asking that this Court assume original jurisdiction and issue a writ of mandamus ordering the City of Edmond to comply with a collective bargaining agreement which was reached through the procedures of Section 51–108. The City of Edmond urges that mandamus is not proper because Section 51–108 did not become law until two months after the collective bargaining agreement was to become effective.

On March 14, 1994 the FOP entered negotiations with respondent for a new collective bargaining agreement to become effective July 1, 1994. On April 14, 1994, petitioner requested arbitration of unresolved issues. It was not until August 25, 1994, after negotiations had begun, and after the statutorily-mandated effective date of the collective bargaining agreement, that § 51–108 became effective. The parties continued negotiations through September. The arbitration board heard the remaining issues on September 20, 1994 and rendered its decision on October 14, 1994. The board accepted the "last best offer" of the FOP.

The City of Edmond did not submit a "last best offer," and has refused to recognize the decision of the arbitration board. It claims that Section 51–108 is inapplicable to this case because it did not become law until several months after negotiations began and after the fiscal year had begun. Petitioner concedes that the general rule calls for prospective application of statutes, but claims that the legislature intended the statute to apply retroactively. Briefs filed by the amicus curiae Municipal League of Oklahoma urge that the statute is unconstitutional.

### International Union of Police Associations, Local 24 v. City of Lawton and Fraternal Order of Police, Lodge No. 165 v. City of Choctaw

Both of these cases involve summary judgment granted in favor of the cities. Both

unions initiated negotiations for new collective bargaining agreements on July 16, 1994, for the following fiscal year of 1995–1996. No agreement was reached, and the parties have both agreed that the "matter is ripe for arbitration." Both cities filed motions for summary judgment in their respective district courts, alleging that Section 51–108 is unconstitutional. Both district courts agreed, holding that Section 51–108 is an unconstitutional infringement on local government. Although the Oklahoma County District Court did not elaborate on the ruling, the order of the Comanche County District Court states that Section 51–108 "effectively removes the duly elected officials of the City ... from control of the Municipal budget and may result in an indirect 'tax' to the citizens of the city. . . ."

## THE FIRE AND POLICE ARBITRATION ACT

The Legislature first passed the Fire and Police Arbitration Act in 1971. The first section stated that as a matter of public health, safety and welfare the right to strike is withheld. 11 O.S.1991 § 51–101. The Act went on to provide for arbitration in the bargaining process, but interest arbitration was non-binding.

In 1985 the Legislature attempted to give the employees relief in the event their collective bargaining agreements were not renewed, with a provision requiring continuation of the old agreement until a new one replaced it. That part of § 51–105 was called the "Evergreen Clause." We were compelled to strike down the "Evergreen Clause" when the cities correctly pointed out it violated our Constitution's Art. 10 § 26, forbidding municipal indebtedness payable out of revenues beyond the current fiscal year. *Del City v. F.O.P. Lodge 114*, 869 P.2d 309 (Okla.1993). In response to *Del City* the Legislature amended § 51–108 to read as we earlier set it out, in effect mandating binding interest arbitration, but with the twist that if the City Council's best offer is not chosen by the arbitrators, the Council may call a special election and submit it to a vote of the people.

Interest, or impasse arbitration, involves the actual formation of the collective bargaining agreement. It provides for the submission to an arbitrator of a dispute concerning the terms of the contract, and "in effect, writes the parties' collective bargaining agreement." *City of Bethany v. Public Employees Relations Bd.*, 904 P.2d 604 (Okla. 1995); *see also American Metal Products Inc. v. Sheet Metal Workers Internat'l Ass'n*, 794 F.2d 1452, 1455 (9th Cir.1986). Once an agreement has been reached, any issues which arise under the agreement as to its application or interpretation may be submitted to grievance arbitration. 11 O.S.1991 § 51–111.

We have repeatedly upheld the Act's goal of permitting and encouraging the exercise of the right of these groups to use a collective voice to speak with their municipal employers. *City of Tulsa v. Public Employees Relations Bd.*, 845 P.2d 872, 875 (Okla.1990); *Stone v. Johnson*, 690 P.2d 459, 461 (Okla. 1984); *Midwest City v. Cravens*, 532 P.2d 829, 834 (Okla.1975). We have also held that the collective bargaining power of police and firefighters is a matter of statewide concern and is not subject to purely local control. *Tulsa*, at 875; *Stone*, at 461; *Oliver v. City of Tulsa*, 654 P.2d 607, 609 (Okla.1982). We upheld the provision requiring both parties to bargain in good faith. *Tulsa*, at 875.

Aside from upholding the provisions which require good faith collective bargaining, other various provisions in the Act have been upheld. Most recently, in *City of Bethany v. Public Employees Relations Bd.*, 904 P.2d 604 (Okla.1995), we upheld the Act's imposition of mandatory grievance arbitration. As we stated, "grievance arbitration is ordinarily referred to as contract interpretation and it originates only after the parties have reached a complete agreement on the terms and conditions of employment." *Id.* at 609 n. 12.

## THE CONSTITUTIONALITY OF MANDATORY BINDING INTEREST ARBITRATION UNDER THE ACT

The unions' arguments in favor of Section 51–108's constitutionality hinge on the idea that the binding interest arbitration is not an unconstitutional delegation of authority to arbitrators, and does not usurp power of mu-

nicipal officials. The unions urge that by giving up the right to strike, they are entitled to something more than just collective bargaining. While there is no dispute that this leaves city officials with less control over budgetary matters, the unions urge that the delegation of power to arbitrators, and ultimately to the electorate, is needed to give balance to the FPAA. They rely on cases from other jurisdictions which have upheld binding interest arbitration. *Municipality of Anchorage v. Anchorage Police Dept. Empl. Ass'n,* 839 P.2d 1080 (Alaska 1992); *City of Detroit v. Detroit Police Officers,* 408 Mich. 410, 294 N.W.2d 68 (1980); *City of Amsterdam v. Helsby,* 37 N.Y.2d 19, 371 N.Y.S.2d 404, 332 N.E.2d 290 (1975); *City of Warwick v. Warwick Regular Firemen's Ass'n,* 106 R.I. 109, 256 A.2d 206 (1969).[1]

The municipalities raise a variety of arguments under the Oklahoma Constitution. First, they urge that Section 51–108 takes power over budgetary matters away from city officials in violation of Article 18, Section 3's "home rule" doctrine. They also claim that it violates Article 5, Section 46's prohibition against special laws. They assert that it violates Article 18, Section 4, as being a mandated referendum on an administrative matter. Finally, they claim it is essentially an indirect means of taxation in violation of Article 10, Section 20, and is not in conformance with the mandates of Article 10, Section 26. The municipalities also claim the new amendment violates United States Constitution, Article 4, Section 4.

We have never before been faced with legislation such as Section 51–108. Each prior time we have been asked to look at the Act, the FPAA imposed the requirement of collective bargaining, but did not mandate binding interest arbitration. Section 51–108 involves interest arbitration by requiring each party to submit a "last best offer" as to acceptable terms for inclusion in the collective bargaining agreement. The arbitrators then choose which offer is best, and thus select the terms of the contract. If the municipality's offer is not chosen, it may then be submitted to a vote of the citizens. In reviewing this statute, we realize that a statute is presumed constitutional, and will be upheld unless it is clearly and plainly inconsistent with the Constitution. *Reherman v. Okla. Water Resources Bd.,* 679 P.2d 1296 (Okla.1994).

## A. ARTICLE 18, SECTION 3

■ Article 18 deals with municipal corporations and § 3 provides for so-called charter cities, allowing autonomous self-governance known as the "home rule" doctrine. But if a matter of local government is held to be also a matter of statewide concern, the city council may have to yield to the Legislature.

In *City of Tulsa v. P.E.R.B.,* 845 P.2d 872 (Okla.1990) the City made the same argument made here, citing Article 18 of the Constitution. In that case, the City argued that the Act improperly intruded on its constitutional status as a home rule city under Article 18, interfering with its right to make and implement decisions about its employees. We reviewed the basis for the City's argument and the basis for the constitutional home rule provisions and held that home rule under a city charter had to give way when matters of statewide interest such as police and fire bargaining intervened. *Id.* at 874–876.

In that case we traced the applicable authorities and reiterated prior holdings:

"[T]he line between 'general matters of the state and its government' and 'merely municipal affairs' is the judicially accepted boundary between the domain in which the legislature is supreme and that in which the cities may insist upon independence." The determinative question is whether the issue involves a matter that is purely municipal, or whether there is a wider public interest. (citations omitted)

*Id.* at 875.

We went on to observe that we had previously defined the rights provided to employees by the Act as "matters of statewide concern". *Id.* at 875. Because the rights

---

1. None of these states have a statutory scheme similar to that in the newly-enacted Section 51- 108.

contained in the Act are matters of statewide concern, we specifically found that they did not violate the home rule provisions of Article 18, Section 3 of the Oklahoma Constitution. *Id.* at 875. Since police and fire protection is a matter of statewide concern, the legislature has the power to enact laws such as the FPAA to insure continuity of protection and resolution of disputes regarding the actual rendering of those services by officers and firefighters. We continue to adhere to our position that collective bargaining for police and firefighters is a matter of statewide concern. *Midwest City v. Cravens,* 532 P.2d at 834.

■ As stated by an Ohio court, "the magnitude of statewide concern can lift what traditionally may have been a matter of local self-government to the level of a police regulation thus exempting it from municipal regulation." *City of Columbus v. State Empl. Rel. Bd.,* 29 Ohio Misc.2d 35, 505 N.E.2d 651, 658 (1985); *see also City of Amsterdam v. Helsby,* 37 N.Y.2d 19, 371 N.Y.S.2d 404, 406, 332 N.E.2d 290, 292 (1975).

> ... [C]ity police officers and firemen are sometimes assigned duties beyond their cities, but this is hardly need to demonstrate a state concern. Large complexes of state buildings and state personnel such as college campuses, and indeed the State Capitol, executive officers, and this court, depend on the quality of police and fire protection within city limits, and thousands of persons who frequent city streets and business districts every day are not city residents.

*City of Roseburg v. Roseburg City Firefighters Local No. 1489,* 292 Or. 266, 639 P.2d 90, 96 (1981). Because police and fire protection is a matter of statewide concern, we stay with our ruling in *Cravens* that this is not a violation of the "home rule" doctrine.

The cities point out that in *Cravens* while approving collective bargaining we noted that the cities retained the right to make the final decision. *Id.* at 833. Thus the FPAA so said at that time. Now the Legislature has changed the process, but it is still the city's final decision. No one can require the city to accept the agreement unless the city, either through its council or its voters, agrees.

The Oregon Supreme Court explained the relationship between public safety and binding arbitration, declaring, "... binding arbitration is essentially a quid pro quo for the prohibition of strikes by firemen. Together, these statutes protect the public from interruption of essential health and safety services while recognizing the employees' right to engage in meaningful collective bargaining." *Medford Firefighters Ass'n v. City of Medford,* 40 Or.App. 519, 595 P.2d 1268, 1271 (1979).

■ An issue related to "home rule" is that of delegation of powers. Clearly, a legislative body may not abdicate its lawmaking powers, but it may permit a subordinate body or person to exercise authority as long as there are sufficient standards prescribed. *City of Detroit v. Detroit Police Officers Ass'n,* 408 Mich. 410, 294 N.W.2d 68, 84 (1980). In *Carofano v. City of Bridgeport,* 196 Conn. 623, 495 A.2d 1011, 1017 (1985), the Connecticut Supreme Court addressed this question when faced with the constitutionality of binding interest arbitration. The court held that delegation of authority to an arbitrator was permissible because there were sufficient guidelines and standards set forth in the legislation. The legislation stated that the arbitrator was to consider things such as the prevailing market with regard to benefits and working conditions, ability of the municipal employer to pay and the general welfare of employees. Thus, the delegation of authority carried with it standards by which the arbitrator must be guided.

In the present case, the stated legislative purpose behind the Fire and Police Arbitration Act, found in Section 51–101, is that the protection of the public mandates that police and fire fighters not be accorded the right to strike. In exchange for this, these public servants are given the right to collectively bargain. This bargaining process now includes the right to binding mandatory interest arbitration, under Section 51–108. Section 51–109 requires that the arbitrators give weight to factors such as a comparison of wages and benefits with prevailing wage rates, interest and welfare of the public and revenues available to the municipality. Simi-

lar guidelines were noted by the Alaska Court in approving their statute for binding interest arbitration. *Municipality of Anchorage, supra* at 1085, 1086. We hold this delegation of power is accompanied by sufficient guidelines.

## B. ARTICLE 10, SECTIONS 20 AND 26

■ Article 10, Section 20 of the Oklahoma Constitution gives a municipality (and not the Legislature) the power to impose taxes for municipal purposes. *Tulsa,* at 877.[2] Under § 51–108 the city, by it's electorate, has the ultimate decision should the city council disagree with the arbitrator's choice. We do not find persuasive the cities' reliance on *City of Ardmore v. Excise Board,* 155 Okla. 126, 8 P.2d 2 (1932). There we imposed limitations upon the power of the excise board to override, in certain instances, the acts of the city council. Here the ultimate decision resides with either the city council or the people themselves. If the city chooses to raise salaries for its firefighters and police it is that city's act, and not the Legislature's. Additionally, *City of Ardmore* did not involve the FPAA and the statewide-concern status we have given fire and police bargaining power. We find no Section 20 infirmity here.

Article 10, Section 26[3] is intended to insure that a city does not exceed its debt limitation. *Del City v. Fraternal Order of Police,* 869 P.2d 309, 311 (Okla.1994).[4] The Legislature cannot overrule this constitutional provision.

*Id.* "Our democratic system demands that governmental bodies retain their accountability to the citizenry." *Mindemann v. Independent School District,* 771 P.2d 996, 1000 (Okla.1989). Municipal officers are charged by statute with the duty of overseeing the municipal budget. *See* 11 O.S.1991 § 17–205 et seq. Any monies received or expended by a municipality must be accounted for in the budget submitted by the governing body. *See* 11 O.S.1991 § 17–207. Any officer or employee who violates these municipal budgetary laws can be subject to criminal and civil sanctions, including personal liability on the part of the municipal officer. *See* 11 O.S.1991 § 17–101, § 17–211 and § 17–104[5]. The Oklahoma Constitution sets forth certain requirements that must be followed by municipalities when determining their budget. *See* Okla. Const. Art. 10, Section 26.

On its face, Section 51–108 does not violate either Section 20 or Section 26. It does not expressly impose a tax on municipal citizens, nor does it expressly require that the city's debt limitation be exceeded. The facts presented in each of these cases do not involve a situation wherein the agreement has caused municipal officials to exceed the revenues collected for the year. We must caution, however, that the new Section 51–108 could be unconstitutional as applied. For example, if a collective bargaining agreement chosen by the arbitrators, or by the people in an election, forced city officials to exceed debt limitations in order to provide other services

---

2. This section reads:
   § 20. Taxes for county, city, town; or municipal purposes
   The legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect taxes.

3. Article 10, Section 26 reads in pertinent part:
   Except as herein otherwise provided, no county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof. . . .

4. At least one city has come upon fiscal difficulties and has amended its Act to make interest

arbitration no longer binding. *Local 22, Philadelphia Firefighters Union v. Commonwealth,* 531 P.A. 334, 613 A.2d 522, 524–526 (1992).

5. § 17–204 reads:

   Any governing body member who intentionally votes to appropriate money or to allow any bill or claim which is not authorized by law shall be personally liable to the municipality for the amount of such money appropriated, or bills or claims allowed, with costs of suit, in an action before any court of competent jurisdiction.
   § 17–101 states in relevant part:
   A. Any act of a municipal governing body which provides for the borrowing of monies or for appropriating monies shall not be valid unless a majority of the governing body of the municipality votes in favor of the action.

necessary to the citizens, it could be considered unconstitutional under Section 26. Another example wherein the statute might be unconstitutional would be if the electorate votes, by a fifty-something percent majority, to adopt a contract which would exceed the city's debt limitation. Section 26 requires that such measure be adopted by not less than a sixty percent majority vote.

## C. ARTICLE 5, SECTION 46

The Oklahoma Constitution, Article 5, Section 46 reads:

> The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:
>
> * * * * * *
>
> Regulating the affairs of counties, cities, towns, wards, or school districts:
>
> * * * * * *
>
> For the opening and conducting of elections, or fixing or changing the places of voting;
>
> * * * * * *
>
> Creating offices, or prescribing the powers and duties of officers, in counties, cities, towns, election or school districts. . . .

Article 5, Section 59, must be construed together with Section 46. Section 59 reads:

> Laws of a general nature shall have uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted.

Section 59 thus permits—except in the twenty-eight instances set out in Art. 5, Section 46—the legislature to enact a special law only when a general law will not accomplish the legal purpose intended. *Reynolds v. Porter,* 760 P.2d 816, 822 (Okla.1988).

■ The inquiry which must be addressed to determine whether there is a violation of section 46 is simple: (1) Is the statute at issue a special law or a general law?, and (2) if it is a special law, does it fall within one of the enumerated situations in which a special law is never constitutional? *Id.* A statute is general if it relates uniformly to or involves all persons or things in a given class. A statute is special if it relates

to only particular persons or things within a class. *Id.; Jack v. State,* 183 Okla. 375, 82 P.2d 1033 (1938).

In *City of Bethany, supra,* we addressed the question of whether another section of the FPAA violated Art. 5, Section 46. We held that it did not "because it operates and applies equally to all cities and fire fighters who engage in collective bargaining." *Id.* at 615. Likewise, Section 51–108 applies equally to all cities and to all those police and firefighters involved in the collective bargaining process. Section 51–108 is not violative of Art. 5, Section 46.

## D. INITIATIVE AND REFERENDUM

■ The cities urge that Section 51–108 violates the people's power of initiative and referendum, as it calls for an election on an essentially administrative matter. The Oklahoma Constitution, Article 18, Section 4, reserves to the people of a municipal corporation the right to petition for amendments to its charter. This right of initiative and referendum has repeatedly been held to apply to legislative matters, but not to administrative matters. *Fite v. Lacey,* 691 P.2d 901, 905 (Okla.1984); *In re Supreme Court Adjudication of Sufficiency of Initiative Petition,* 597 P.2d 1208, 1211 (Okla.1979); *Brazell v. Zeigler,* 26 Okla. 826, 110 P. 1052 (1910).

■ The present case does not present an issue relating to initiative or referendum. "Initiative is the power reserved to the people by the constitution to propose bills and laws and to enact or reject them at the polls independent of the legislative assembly." *Wyatt v. Clark,* 299 P.2d 799, 801 (Okla. 1956); *see also In re Initiative Petition 348,* 820 P.2d 772, 774 n. 1 (Okla.1991). Section 51–108 is not proposed general legislation presented through the petition process to the citizens of the municipality for a vote. The statute itself was passed by our state legislature and became effective in 1994. Although an election is permitted under the statute, the election is merely to ratify or reject the collective bargaining agreement. The election in no way alters the statewide effectiveness or application of Section 51–108. This assignment is without merit.

## E. REPUBLICAN FORM OF GOVERNMENT

■ Finally, the municipalities assert that the amendment to Section 51–108 violates the republican form of government as guaranteed by the United States Constitution, Article 4, Section 4. The municipalities claim that because local elected officials are deprived of the power to make contracts, the representative form of government is circumvented.

The Guarantee Clause, Article 4, Section 4, provides that the United States shall "guarantee to every State ... a Republican form of Government." Although past case law has suggested that controversies arising under this clause are not justiciable, the United States Supreme Court has acknowledged that certain matters may be justiciable under this Clause:

> We approach the issue with some trepidation, because the Guarantee Clause has been an infrequent basis for litigation throughout our history. In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine ... The view that the Guarantee Clause implicates only non-justiciable political questions has its origin in *Luther v. Borden*, [48 U.S. 1, 7 How. 1, 12 L.Ed. 581] (1849), in which the Court was asked to decide in the wake of Dorr's rebellion, which of two rival governments was the legitimate government of Rhode Island. The Court held that 'it rests with Congress,' not the judiciary, 'to decide what government is the established one in a State.' Over the following century, this limited holding metamorphosed into the sweeping assertion that 'violation of the great guaranty of a republican form of government in States cannot be challenged in the courts.' *Colegrove v. Green*, 328 U.S. 549, 556, [66 S.Ct. 1198, 1201, 90 L.Ed. 1432] (1946) (plurality opinion).

> This view has not always been accepted. In a group of cases decided before the holding of *Luther* was elevated into the general rule of nonjusticiability, the Court addressed the merits of claims founded on the Guarantee Clause without any suggestion that the claims were not justiciable ... *More recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions.* (Citations omitted; emphasis added)

*New York v. United States*, 505 U.S. 144, 184–85, 112 S.Ct. 2408, 2433, 120 L.Ed.2d 120 (1992).

In *In re Initiative Petition No. 348*, 820 P.2d 772, 780 (Okla.1990), we addressed the question of whether the proposed legislation contained in an initiative petition violated the Guarantee Clause. This proposed law required that all revenue raising bills passed by the legislature be approved by the state citizens at the next election unless the bill was passed by three-fourths majority of the legislature. Opponents to the initiative petition argued that this proposal deprived elected representatives of their power, and thus violated the Federal Constitution's guaranty of a representative form of government. We held that it did not. While we agreed that the proposed legislation impacted the power of the elected representatives, it did not deprive them of the power to pass revenue raising bills. It merely made it more difficult.

In *In re Advisory Opinion to the Governor*, 612 A.2d 1, 16 (R.I.1992), the Rhode Island Supreme Court addressed rights provided under the Guarantee Clause holding that it "necessarily implies a duty on the part of the States themselves to provide such a government." The court continued by concluding that "a republican form of government contemplates representative government and, the states being obligated to provide such government, obviously they have the power to establish and maintain such government." *Id. quoting Opinion to the Governor*, 95 R.I. 109, 185 A.2d 111, 114 (1962).

Even if the issue presented in the present case is one which is justiciable under *New York v. United States, supra*, the cities' argument must fail. In no way does Section 51–108 affect the rights, duties and powers of state officials elected to represent their constituents. The Guarantee Clause has never

been applied to a municipal government. In the few limited cases in which it is discussed, the focus has been on the duty of the state to preserve a republican, or representative form of government. *See, e.g., New York,* at 185, 112 S.Ct. at 2433. Because Section 51–108 does not in any way limit the state's republican form of government, the Guarantee Clause has never been applied to a municipal government. We thus need take no stand on the justiciability of the issue.

## RETROACTIVE APPLICATION OF THE STATUTE

■ In *Ferling v. City of Edmond* the Unions' assert that Section 51–108 is retroactive in application. Admittedly, the statute did not become effective until at least August 25, 1994. Several months prior to its enactment, on March 4, 1994, the parties began the process of negotiating the collective bargaining agreement for the 1994–95 year and an agreement did not come about until October, 1994. Unions ask that this Court invoke its original jurisdiction and issue a writ of mandamus to require bargaining under the amended Section 51–108.

City of Edmond asserts that the amended version of Section 51–108 so drastically changes the entire arbitration process that it should not be applied to those parties already deeply involved in the arbitration process. City claims, and Unions do not dispute, that only a few items remained for resolution by the time the amendment became effective.

In order to hold that the amendments to the statute apply this Court would have to reach the conclusion that the legislature intended retroactive application. This we cannot do. The statute makes no mention of retroactive application. While it states that collective bargaining agreements which are reached as a result of Section 51–108 shall be considered to have taken effect on the first day of the fiscal year, the legislature did not state that the statute was intended to apply to all contracts under negotiation at the time of its effective date.

■ Statutes are generally presumed to be prospective in application. *Wickham v. Gulf Oil Corp.,* 623 P.2d 613, 615 (Okla.1981).

This presumption is rebutted when there is legislative intent "expressly declared" or "necessarily implied from the language used." *Id.; Hammons v. Muskogee Medical Center Authority,* 697 P.2d 539, 542 (Okla. 1985). Doubt must be resolved against retrospective application. *Teel v. Public Serv. Co.,* 767 P.2d 391 (Okla.1985).

The amended statute drastically affects the substantive rights of the cities to negotiate and contract. While there are some procedural aspects to the statute, the most crucial parts of the statute change Oklahoma's law to impose mandatory binding interest arbitration. This has never before been the substantive law in Oklahoma. We see no evidence that indicates that the legislature intended for this change to apply to those situations under negotiation. We assume jurisdiction, but decline to issue a writ of mandamus.

## CONCLUSION

We hold that Section 51–108 withstands constitutional attack under Article 18, Section 3, Article 5, Section 46, Article 18, Section 4 and Article 10, Section 20. Article 4, Section 4 of the U.S. Constitution is not implicated. We further hold that on its face, it does not infringe on Article 10, Section 26. We caution, however, that as applied in a situational framework, an agreement reached under the statute may not survive attack unless it conforms to the mandates of Section 26. Finally, we assume jurisdiction in case no. 85,266 but decline to issue a writ of mandamus, because we hold that Section 51–108 does not have retroactive application.

The judgments of the District Courts in cases numbered 85,460 and 85,542 are reversed and the cases remanded for such further proceedings as may be consistent with this opinion.

ALMA WILSON, C.J., KAUGER, V.C.J., and LAVENDER, SIMMS and HARGRAVE, JJ., concur.

HODGES, OPALA and WATT, JJ., dissent.